Good morning ladies and gentlemen. Our first case for argument this morning is Securities and Exchange Commission against Goulding. Mr. Berry. I may please the court. My name is Eric Berry. I'm the attorney for the appellant Randall Goulding. The court now understands this is a case under the 1940 Act, 1940 Investment Advisors Act. Mr. Goulding was an investment advisor. The two issues here today are the District Court properly required that he disgorge certain compensation and whether he properly valued securities that were in the portfolios of the companies that he managed. Mr. Berry, your face is almost impossible to see because you're sitting in front of a bright window and therefore your computer has turned down. Yes. Is that helpful? It's somewhat helpful. The problem is the window. Yeah, I thought that since it was morning time. Okay, that's much better. Thank you. Okay. I'm not sure what I'm exposing in terms of living quarters. But anyway, as we proceed. So, as I was saying, you know, the two issues here today are whether Mr. Goulding should be required to disgorge compensation that he received as the principle of the general partner in managing entity and whether he overvalued securities. With respect to the disgorgement issue, I think it's become a lot simpler since the amendment of the 1934 Act that came into effect just a few days ago. That statute now says explicitly that unjust enrichment, the disgorgement may only apply to a result of a securities law violation. As we argued in our opening brief under Lew v. SEC, the Supreme Court imposed a causality requirement. The Supreme Court has now expressly stated that disgorgement is only available to the SEC if it stems from an adjudicated securities law violation. And our position was that there was no causal connection. There were violations, but all those violations occurred post-offering. There was no fraud in the offering. And the subscription fees that Mr. Goulding is being asked to disgorge were earned solely by reason of the non-fraudulent offerings. Well, what do you make of the district court's statement or finding that Mr. Goulding's wrongdoing, and I think I'm quoting, completely permeated Nutmeg's investment advisory operations of the entire relevant time frame? Any compensation money or other benefit he received from Nutmeg during that period was causally connected to his wrongdoing. So are you saying that's? I disagree. I disagree with the finding of a causal connection. But you don't, you don't, you can't disagree that he made the finding. You might be trying to say. No, I absolutely agree that he, in his original opinion, he made the finding. When we move under Rule 59. And what's the standard of review that you're arguing for here? It's de novo. Counsel, why isn't the standard of review clear error? Why isn't the standard of view clear error? I think the standard review is clear error for the legal question, but it's de novo for fact findings. No, no. It's the other way around. After a bench trial, the standard of review is findings of fact must be sustained unless clearly erroneous. Okay, and so we believe that this finding of causality is clearly erroneous. Mr. Goulding, according to the SEC. But that's a pretty high standard. I'm sure that's why you wanted it. Well, that's why we're here today. I just want to nail down this finding of the kind of causal connection that you are arguing. Certainly the new statute, I think, is pretty clear about that. But the court makes that, and that is a finding of fact, whether A caused B. That's not a conclusion of law. Or are you trying to say it is? Well, I'm trying to, yeah. Well, I believe it's probably a mixed finding of fact, conclusion of law. But let's look at what it is without putting a label on it. We showed, and the SEC, then we'll get to the label. And then the SEC submitted documents that showed that Mr. Goulding's compensation was $642,000. So the question is, is that $642,000 earned as a result of a securities law violation or not? We've argued, and the district court seemed to agree in its post-judgment ruling, that the $642,000 was earned simply by reason of non-fraudulent offerings. There was no allegation in the complaint. There was no allegations pre-trial that these were fraudulent offerings. And Judge Gilbert himself has now twice found that the subscription fees that Goulding was entitled to were not dependent on anything other than the completion of the offering. So the money was earned in the offering process. It has not been determined to be fraudulent. Then you have post-offering activities. And post-offering activities, the SEC has found, the SEC's alleged, and Judge Gilbert has found, record-keeping violations, failure to segregate accounts, failure to have the company properly audited. And we're not appealing those, and we're not disputing them here. But those failures, those security law violations that do not relate to the offerings, but relate to the application of proceeds, are not causally connected to the subscription fees, because Judge Gilbert himself has specifically found that the subscription fees, the 3 or 4 percent fees, were earned solely by reason of the offerings. Now, in the old days... Did Judge Gilbert also, though, say, I mean, in your brief, you made it sound as though it was some sort of, that there had been some sort of finding that there was something inherently wrong with Excel spreadsheets. But actually, what the district court found, there's nothing really wrong with Excel. It depends what you put in it. But the court found that there was lots of inaccurate information in it, incomplete information, and, in a sense, that these books and records were a mess. So the court was trying to make the best estimates it could out of this global situation, all these different funds, and what was going to nutmeg, and what was Mr. Goulding skimming off for himself, and all the rest of it. So why, again, is that not something to which we owe debt? That does not change the analysis under Liu and under the recent amendment. The question, because anything that happened post-offering did not unduly enrich Mr. Goulding, and it didn't take any money away from any investors. The money that he was entitled to, simply by reason of the offerings themselves, was $869,000, according to the SEC's own documents. He earned... So let me ask you this. Suppose there were... I'm going to simplify the numbers. But suppose there was an account that had $2 million in it, and $1 million of those dollars were causally connected to the violations of the statute, and the other million may have been free and clear. Does he get to take the free and clear... How does he... I think that's right. I think that if there's $2 million in profits generated, $1 million is causally connected to a securities law violation, either a violation in an offering, or a violation in the use of proceeds section, violation of contractual obligations of the offering proceeds, then that $1 million would be disgorged. Here, and the other million dollars, the defendant would not be liable to disgorge. Here, the situation is, there is no showing that because of these record-keeping violations, and because of the failure to segregate the use of the relief defendants, that Mr. Goulding benefited in any way, or improperly benefited from those violations. He simply did not. The money he was entitled to receive under the SEC's own documents is $869,000 attributable solely to the offerings. Now, the SEC also finds that he received another $342,000 as a result of overvaluation, of valuation, and carried interest or performance-based compensation. And the SEC says that was $26,000 off. Still, that number, that $26,000 in additional compensation to the $642,000, you're still within the $869,000 entitlement. So here, there is no showing that Mr. Goulding was unjustly enriched by any kind of securities law violation. You should respond a little bit then to what the commission listed in its brief. There's a whole section of its brief entitled, Goulding engaged in numerous violations of the Act, and those violations enriched Mr. Goulding, so they say. I believe that all those violations of the Act occurred subsequent to the offerings, and the SEC has not even attempted to connect any post-offering violations to any kind of undue compensation, or unjust enrichment, or any compensation at all. The SEC has never shown that this record-keeping violation, or this use of a relief defendant, or the failure to get an audit ever caused Goulding to receive compensation that was in excess of what he was entitled to under the written terms of the agreements. And I don't see the connection, and I tried the case, and to this day, I don't see any connections. Now, there was one point at the trial where the SEC was trying to show that this general ledger indicated that Mr. Goulding had taken in excess of $418,000, but it came out that the SEC was misinterpreting what the minus sign meant. So a part, because a minus sign means a an entitlement that money to Goulding was at that point in time owed by NMIG. And, you know, so that's not something that is sufficient to show there's any misallocation. Just Gilbert, as I can tell, never made any specific findings about an amount that Mr. Goulding was entitled to, and that was a violation of his contractual obligations. Very simply, if we're talking about post-offering fraud, the question is, did the issuer's compensation exceed, or was it within the contractual entitlements? And here, the SEC has not shown that Goulding misallocated any of the agreed use of proceeds whatsoever. If, for example, if Goulding had, you know, shipped money overseas and not gotten something back, and not, that would have been a misallocation. Here, it's shown that of the money that he took, what he received as compensation, what he might be liable to disgorge, of that $642,000, the entire amount was within his non-contingent obligations, simply non-contingent entitlements, simply by means, by reason of the SEC's offerings. And these offerings have not been held to be fraudulent. If, you know, the logic is, of the law, I think is very clear now. If there's a fraudulent offering, then every dollar that comes in is ill-gotten. And no matter what you do with it, if you apply it in accordance with the use of proceeds sections, if you apply it improperly, it's still subject to disgorgement. But if there's not a fraudulent offering, then in order to show a securities law violation, you have to show that the money was spent in a manner that violates the agreements. And here, the SEC did not even attempt to show that the money that Goulding received was spent in violation of the agreements. And if it's okay, I would like to, if there are any questions now, I'll answer them, but I'd like to reserve five minutes of rebuttal time. Certainly, counsel. Ms. Mishra. Apologies, I needed to unmute. May it please the court, Dina Mishra for the Securities and Exchange Commission. After an 11-day trial, Randall Goulding, a Securities Lawyer and Investment Advisor, was found to have violated his investor's money for himself and relatives, treating Nutmeg as his quote, personal piggy bank. He also paid his own law firm, commingled assets, systematically misvalued and over-reported fund investments, contrary to promises and producing inflated fees. He failed to disclose and made misleading statements about this misconduct and more throughout, in addition to his auditing and books and record misconduct. He did all this with Sienter as a lawyer with a prior tax fraud conviction who admitted knowing of the duties he violated, and who was warned by another lawyer against much of it. Goulding appeals only a small portion of the liability and remedies rulings, making mostly unpreserved and only meritless fact-intensive challenges that do not meet the governing standards, including clear error review. I'd be happy to address a few clarification points if that's all right, or I'm happy to answer questions if there are questions first. Ms. Mishra, on the disgorgement issue, after lieu, is there any more reasonable approximation when determining the amount of disgorgement, or does lieu take that concept of reasonable approximation out of the calculus? So as we know, lieu does not take it out of the calculus, and the reasons are explained in our brief. Some of the very cases that Mr. Goulding cited actually reinforce the notion that once there is the reasonable approximation, the burden shifts to the defendant to demonstrate what apportionment might actually be taken out of that. And the in this case in particular is because Mr. Goulding's commingling was the kind of wrongdoing and violation that also makes any doubt or ambiguity in the measurement, in the reasonable approximation, it redounds to his detriment. And that's fairly clear from all the case law prior to lieu. Lieu did not say anything to undercut that, and as we've noted in our brief, the cases cited actually reinforce it. So there are, I suppose, a few points of clarification as to Mr. Berry's argument for Mr. Goulding that we might make here. One of them is that a lot of the focus on the connection to a fraudulent offering is a little beside the point because Mr. Goulding's opening brief actually talked about also including misuse and talked about how the misappropriation, we talked in our brief about how misappropriation would constitute misuse. So you don't even need to get into any of the fraudulent offering stuff, although we've also outlined things in our brief about that. So that issue doesn't even need to be really implicated here, but it's also the case that as we've explained in our 28J letter in our brief, that there is no requirement that there need to be a connection specifically, especially to a fraudulent offering or to misuse of that especially in this type of Advisors Act case where it's clear that there's breach of fiduciary duties in violation of the Act, and that provides many breaches, to be quite frank, that provide the basis both for liability and much of which is uncontested and for disgorgement. We could talk more specifically about some of the factual issues if the court has any questions about them. There are certainly some inaccuracies with respect to talking about what was and wasn't found by the trial court with respect to the misappropriation. There are findings, I believe they're at Required Short Appendix 76 to 78, that lay out some of the reasoning why this was clearly misappropriation in the first instance, and there are also there's also findings specifically, I believe it is at Required Short Appendix 82 and Footnote 1, that directly address Mr. Berry's point for Mr. Goulding about the credit debit issue and that expressly found Ryan Goulding not credible, laid out reasons for that, and that's something that is absolutely one of the things that the trial court would get on. I could go to some other issues, but I think those clarify some of the most important, so if the court has any further questions, I'm happy to address them. Otherwise, we'll rest. No, oh, I'm sorry, I didn't realize you were resting. I want you to discuss for a moment Mr. Goulding's argument that the injunction that was entered was just an extremely vague obey the law injunction, rather along the lines of something, you know, in any trust case that says don't monopolize, conspire to monopolize, or agree to monopolize, and no one would know what that means. Isn't this pretty vague for Rule 65 purposes and contempt? So we don't believe so, and we think that this court has already largely found that appropriate and proper relief in circumstances that aren't even as pressing for that type of injunction as this one. But excuse me, doesn't this depend on the statutory language? People have a right to know if they are about to undertake a course of conduct that may throw them in jail for contempt of court. There are due process concerns here, and so I mean, I can think of statutes that are very granular that would provide plenty of notice, and I can think of statutes such as Sherman Act Section 2 that are extraordinarily broad, and I want to know where this one falls and whether this is a point that just got rushed over by the district court that needs some more attention. So we hope that we've given it that more attention in our brief because we haven't just laid out the case law that specifically says that injunctions that take this form are appropriate, but we also laid out in page 60 of our brief we talked about why they would be sufficiently apprising defendants of the conduct that they prohibit this particular statute. And so we've cited a case from the Second Circuit that provides some reasoning that we think may be helpful on that point. Let me ask my colleague's question in a different way. Sure. Where did the district court explain why it was entering such an injunction? Sure. So the trial court provided several pages of analysis, not just in the context of the injunction, but also when it discussed the other remedies, because it laid out some of the and in the factual findings, which it referenced in the injunction. But I can, if you allow me one moment, I will. I, for that matter, I can't find the injunction. Oh, it's so here's Not in Mr. Golding's brief, but it's in Mr. Golding's brief. It's not in the very lengthy appendix. It is part of the judgment, and it is also laid out in, where is it? Excuse me. I apologize. I'm just trying to find the required separate appendix. If I were to guess, if I were to guess, I think that what Judge Easterbrook is pointing out is that there does not seem to be a piece of paper that says at the top of it Rule 65 injunction, and then as a stand-alone matter, sets forth the injunction. You can find embedded in other documents that the district court issued. Yes. That's certainly what I'm saying, and it's something this Court has required. Yes. Are you saying a separate, a separate paper? A separate document complying with Rule 65. Right. I believe that that Unless it's in secret, because it's not in any of the appendices. So I apologize, because at this moment, I am having trouble finding my required short appendix. But I believe it's actually It's not there, though. I mean, it's, as I said, it's embedded in Yeah, I looked for it, too. And the Court talks about it when the Court enters the what's like the final, final judgment, whatever I should call that, this March 25th memorandum of opinion in order. That's actually reconsideration. Then we have this about four-page thing, final judgment as to defendant Randall Goulding, which was filed 11-12-19.  The reason that, in case you're wondering, we're not being picky. Again, it dates back to the fact, or it harkens back to the fact that if there's an injunction, that's a court order enforceable with rather strong penalties, and people shouldn't have to sift through opinions and sort of deduce from them what it is, under pain of contempt, they are to do or not to do. And, of course, one of the problems, one of the concerns about an injunction, even a real Rule 65 injunction that just says follow the law, is that it becomes a shortcut for cutting out procedural protections, such as the right to a jury trial, either criminal or civil. The judge, in the future, can then just wave his hand and say you're in contempt, and all of the normal procedures just fall away. And that's a subject of some concern. So if, for example, the injunction had just said, Mr. Goulding is enjoined from appearing before the commission in his capacity as a lawyer, that would be very specific. You would know exactly what that was. He would know if he filed an appearance that he was in violation. And that would have been one of those things, if the court thought that was a necessary aspect of a long-term injunction, it could be there. And I'm not going to make up the whole injunction, but that kind of thing is specific enough that somebody knows what they're supposed to do. I understand, Your Honor. I think that here, because of the nature of Mr. Goulding's violations and because Mr. Goulding, for example, also agreed to an injunction that had the same form in the form of the preliminary injunction and the extension of the temporary restraining order that took that exact form, I think this would be a poor case in which to try to expound on some of those principles. As to the separate document, I apologize because, as I said, I am having trouble finding the document right now. I had thought it was in the judgment. But if it is not in the judgment, even so, those other injunctive documents, which have the same form and the only form in terms of the actual challenge that's been presented by Mr. Goulding with respect to the injunction, so the one in which we were able to prepare to address it directly in this oral argument, because that was the presented argument. So I think that document, as I said, some of the agreement elsewhere may vitiate some of the concern that this court may have for it in this context. And we'd be happy to further look into it if it's something else that the court really feels discomfited by. But as we said, our position would be that this was not a challenge raised by Mr. Goulding, and it's one of the types of things that would need to have been raised as a problem with the injunction for us to have had the opportunity to fully flesh out our response as well. I have another question. We'll think about Rule 65, or at least I'll think about Rule 65D. At some point, you refer to Mr. Goulding valuing these convertible notes with formulaic discounts, although inconsistently, sometimes you seem to say he's just attributing the value of the current stock price of the freely traded portfolio company with no discount. What is it exactly? What's the commission's argument? I apologize. I didn't hear the first possible argument. Well, you refer to formulaic discounts, which makes me think there's a formula. And I would like to know whether that's it or whether the formula wasn't really a formula. It was just a practice of assigning the value to the convertible notes of the current freely traded stock price of the underlying equities. Oh, so it was a formula, and the testimony goes to that for the long duration of time, up until there was a very late memo that indicated they might do otherwise, although I believe that they indicated that. And I want to say it's either PX226 or PX227. I believe those are the late memos. In one of them, I believe they indicated they would continue to do that. They would, excuse me, that they would start doing liquidity discounting, and there was testimony from one of Mr. Goulding's sons about how that didn't happen until that late date. But that when they did that, even once they indicated they were doing that, first, there's the late 2008 memo, which is one of those two that I just numbered, that shows that they were not actually doing that with respect to particular notes and particular holdings that are laid out on the pages, I think, there are 7 and 13 of that one. It's also the case that then even once they were indicating in a, I think it may have been the May 2009 memo, so after this lawsuit commenced, that they would take a liquidity discount. The discount that they described was inconsistent in part because it was formulaic with FAS-157 and the standard that's set out with respect to the ASRs, and more importantly, with respect to the factor-based approach that was promised to be taken in the fund offering documents. And that's something that we lay out in the brief. So at the point that there was a promise to take a factor-based approach, it is a breach of the fiduciary duty under the Advisors Act to then not take that into account. And the factor-based approach includes taking account of restrictions among other factors. Okay. Thank you very much, Counsel. Thank you. Anything further, Mr. Berry? Briefly, I'd like to go back to the disgorgement issue very briefly. Since it's fairly clear there's no offering fraud, you cannot say that the entirety of the proceeds is tainted. But that's not what the Commission said, of course. The Commission was looking for a considerably larger number than the 642-422, and the Court took a pretty conservative approach, you know, just looked at some direct problems, left a lot alone, and then, again, used that number much lower than what the Commission wanted for the civil penalty. I'm talking about what Judge Gilbert said. Yeah, so am I. Okay. So Judge, there's no allegation of offering fraud in the complaint. But why is that necessary? A big part of your argument is there are all these different varieties of fraud. There's offering fraud. There's this and that. But the Magistrate Judge Gilbert finds that there was, as he said, fraud kind of, you know, misconduct permeates. It's a two-step analysis. There's no allegation of offering fraud. There's no evidence of offering fraud, so there's no proof of offering fraud. There's no adjudication of offering fraud. So the offer and fraud cases where all proceeds are tainted do not apply. So the question is this, in the use of proceeds, did Goulding compensate himself more than he was entitled to be compensated? But what about the Commission's evidence of all of this diversion to, you know, the world poker, you know, contest for his father and paying his home equity line? I mean, there's a lot of troubling evidence. There's two responses to that. First of all, if you own an entire company, you're allowed to compensate yourself by paying your own personal expenses. But you're not allowed to loot the company. Well, that's right. So the question, that's exactly correct, and I'm really glad that we finally got to this. Did he loot the company? If he took more than he was entitled to, he looted the company. If he took less than he was entitled to, he didn't loot the company. The SEC's own documents say he's entitled to take 869, regardless of subsequent contingencies. The SEC's own document says he took 642 within the contractual entitlements. This is the SEC's own evidence. So did he loot the company? If he had taken $1 more than he was entitled to, he looted the company. But the evidence doesn't show that. In fact, it shows the opposite. It shows that the entirety of his compensation, paying credit card bills, World Series of Poker, White Sox games, all that has been, according to the SEC's own account, has been calculated as Golding's compensation over the five-year period. It comes out to 642. Golding's entitlement during the same five-year period, even apart for any performance-based compensation, was 869,000 based simply on the subscription fees, the 3% or 4% that the company is allowed to take in as a management fee simply by reason of the offering and pay to its sole owner. Now, what the SEC is hinting at is that this is within what Lou calls the entirely fraudulent operation exception, in which case there's different rules applied regarding expense deductions. First of all, Golding is not trying to take an expense deduction, so it's literally not relevant. Secondly, if you look at the district court findings, this is not a case where any intentional violations post-offering have been found. There's no – and if there were intentional violations, they didn't result in any excess compensation, and it's called an entirely fraudulent operation exception. It's not called an entirely negligent operation exception. All the findings that were made at summary judgment are non-scienter violations. They are sustained by a showing of negligence. And those summary judgment adjudications are not sufficient to show that this was an entirely fraudulent operation. The decisions that we cite, the British American, Wiley, Wallenbrook, all conclude that an entirely fraudulent operation only occurs when there is offering fraud. If you look at Judge Scheinman's decision in Wiley, she comes out and expressly says that. And this is not an offering fraud case, and so the entirely fraudulent operation exception does not apply. There has been no bidding of the company. Thank you. Thank you, Mr. Berry. Thank you, Mr. Berry. Thank you, Your Honor. This case is taken under advisement.